UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| TONYA RANSUM, | } |
| Plaintiff, | } |
| v. | } |
| FRANK J. BISIGNANO, Commissioner of the Social Security Administration,[1] | } Case No.: 4:25-cv-00405-MHH |
| Defendant. | } |

# MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), claimant Tonya Ransum seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner decided that Ms. Ransum was not disabled, and the Appeals Council denied review. Ms. Ransum asks the Court to remand her claim for further consideration based on new medical evidence. For the reasons below, the Court

---

[1] The Court asks the Clerk to please substitute Frank Bisignano for the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

1

grants Ms. Ransum's request and remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Ransum had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically determinable impairment that can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant

---

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." *See* https://www.ssa.gov/disability/professionals/bluebook/general-info.htm [https://perma.cc/VS4Q-HPDA] (lasted visited Feb. 4, 2026).

can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136–37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Ms. Ransum applied for a period of disability and disability insurance benefits on July 18, 2022. (Doc. 7-4, p. 2). Ms. Ransum alleged that her disability began on September 1, 2021. (Doc. 7-4, p. 2). The Commissioner denied Ms. Ransum's claim on May 25, 2023 and denied reconsideration on August 14, 2023. (Doc. 7-4, pp. 16, 17). Ms. Ransum requested a hearing before an ALJ. (Doc. 7-5, p. 21) Ms. Ransum and her attorney attended a telephone hearing before the ALJ on January 11, 2024. (Doc. 7-3, pp. 33–66). A vocational expert testified at the hearing. (Doc. 7-3, pp. 59–65).

The ALJ issued an unfavorable decision on February 29, 2024. (Doc. 7-3, pp. 8–25). On January 17, 2025, the Appeals Council declined Ms. Ransum's request for review, (Doc. 7-3, pp. 2–4), making the Commissioner's decision a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

During the administrative proceedings, Ms. Ransum submitted medical evidence documenting a history of depression, anxiety, chronic obstructive pulmonary disease (COPD), hypertension, hypothyroidism, osteoarthritis of the hands, disorder of the spine, obesity, and fibromyalgia. (Docs. 7-9, 7-10, 7-11, 7-12, 7-13, 7-14, 7-15; s*ee* Doc. 7-3, pp. 14–15). During her administrative hearing, Ms. Ransum testified that she experienced symptoms of depression, fibromyalgia, COPD, lupus, and arthritis. (Doc. 7-3, pp. 42–48).

Ms. Ransum testified that her most severe condition was depression. (Doc. 7-3, p. 42). Ms. Ransum testified that for the three years preceding her hearing, her depression had caused memory loss, trouble sleeping, crying spells, rages, lack of energy, lack of appetite, and weight loss. (Doc. 7-3, pp. 42–43). She testified that she had been taking medication for more than ten years and that the medication alleviated some of her symptoms. (Doc. 7-3, pp. 42–43).

Ms. Ransum testified that her next most severe impairment was fibromyalgia. (Doc. 7-3, p. 43).[3] She reported that she experienced sickness, fatigue, depression, trouble sleeping, tingling in her hands and feet, and constant pain. (Doc. 7-3, pp. 43–44). She rated her pain as a nine out of ten without her medication and a seven

---

[3] "Fibromyalgia is a long-term condition that involves widespread body pain." MAYO CLINIC, *Fibromyalgia*, (Apr. 26, 2025) https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780 [https://perma.cc/3KZD-3N4S].

out of ten with her medication, and she indicated that she had experienced "nine-level" pain for 12 hours each day since 2021. (Doc. 7-3, pp. 44–45). Ms. Ransum testified that she had experienced tingling in her hands and feet for three years, that the tingling occurred every three hours, and that the tingling "c[ould] last an hour, and then stop, and then come back." (Doc. 7-3, p. 45). She testified that her fibromyalgia caused problems thinking, memory loss, constipation, and bloating. (Doc. 7-3, p. 45).

Ms. Ransum testified that her next most severe impairment was COPD. (Doc. 7-3, p. 46).[4] She testified that she smoked two packs of cigarettes a day and began smoking when she was 12 years old. (Doc. 7-3, p. 46). She testified that her COPD caused shortness of breath, chest tightness, lack of energy, and an inability to perform physical activities. (Doc. 7-3, p. 46). She reported that she had experienced swelling of her ankles and feet every day for the five years preceding the hearing and that the swelling occurred mostly at night. (Doc. 7-3, p. 46).

Ms. Ransum testified that her next most severe impairment was lupus. (Doc. 7-3, p. 47).[5] She testified that her lupus caused fever, chills, dry eyes, and headaches

---

[4] "Chronic obstructive pulmonary disease (COPD) is an ongoing lung condition caused by damage to the lungs." MAYO CLINIC, *COPD*, (Aug. 30, 2024) https://www.mayoclinic.org/diseases-conditions/copd/symptoms-causes/syc-20353679 [https://perma.cc/SFQ5-2FTB].

[5] Lupus is an autoimmune condition that "causes swelling and irritation, called inflammation, that may affect joints, skin, kidneys, blood cells, brain, heart and lungs." MAYO CLINIC, *Lupus*, (Dec. 12, 2025) https://www.mayoclinic.org/diseases-conditions/lupus/symptoms-causes/syc-20365789 [https://perma.cc/GZM9-978P].

and caused her toes and fingers to turn white. (Doc. 7-3, p. 48). She testified that she ran a fever "mostly every day" and had headaches every day. (Doc. 7-3, p. 48). She rated her headache pain as an eight out of ten and indicated that her headaches typically ended after a three-hour nap. (Doc. 7-3, p. 48). Ms. Ransum testified that she took Celebrex for her lupus symptoms. (Doc. 7-3, p. 48).[6]

Ms. Ransum testified that her next most severe impairment was arthritis. (Doc. 7-3, pp. 48–49). Ms. Ransum testified that her arthritis caused aching pain and stiffness in her joints. (Doc. 7-3, p. 49). She testified that she had experienced this pain constantly for five years. (Doc. 7-3, pp. 49–50). She rated her arthritis pain as a seven out of ten. (Doc. 7-3, pp. 49–50).

Ms. Ransum testified that she could lift half a gallon of milk, could stand in one place for about ten minutes, could walk for five minutes, and could sit for about 45 minutes. (Doc. 7-3, p. 50–51). She testified that she did not do household chores. (Doc. 7-3, p. 51). Ms. Ransum reported that on a typical day, she would sit in her recliner, take a three-hour nap, then "stay up for a little while," nap again, wake up, eat dinner, stay awake for "about an hour," then go to bed for the night. (Doc. 7-3,

---

[6] Celebrex "is a nonsteroidal anti-inflammatory drug used to treat mild to moderate pain and help relieve . . . inflammation, swelling, stiffness, and joint pain." MAYO CLINIC, *Celecoxib (oral route)*, (last updated Dec. 1, 2025) https://www.mayoclinic.org/drugs-supplements/celecoxib-oral-route/description/drg-20068925 [https://perma.cc/Z3PX-JSMU].

pp. 51–52). She estimated that she had spent 18 hours laying down each day for the three years preceding her hearing. (Doc. 7-3, p. 52).

When examined by her attorney, Ms. Ransum testified that she could not concentrate when she tried to watch TV or listen to the radio. (Doc. 7-3, pp. 52–53). She testified that she experienced medication side effects, including increased heart rate, sore throat, nausea, vomiting, headache, dizziness, shortness of breath, lightheadedness, and drowsiness. (Doc. 7-3, p. 54). She testified that she did not get restful sleep at night and would sleep for about four hours at a time. (Doc. 7-3, pp. 54–55). She testified that, when she was working, she would miss about ten days a month because of her medical conditions and symptoms. (Doc. 7-3, p. 55).

Leslie Gillespie testified as a vocational expert at the ALJ hearing. (Doc. 7-3, pp. 59–65). Ms. Gillespie testified that Ms. Ransum had worked jobs that were unskilled or semi-skilled and had light, medium, and heavy exertion levels. (Doc. 7-3, pp. 60–61). Ms. Gillespie answered a series of questions regarding a hypothetical individual with a residual functional capacity described by the ALJ. (Doc. 7-3, pp. 61–64). Finally, Ms. Gillespie testified that employers typically allow workers in unskilled jobs to spend 8–10% of their time off-task and that an individual who needed to nap for three hours during a typical workday could not find employment. (Doc. 7-3, pp. 64–65).

7

## THE ALJ'S DECISION

The ALJ found that Ms. Ransum had not engaged in substantial gainful activity since the alleged onset date, September 1, 2021. (Doc. 7-3, p. 14). The ALJ determined that Ms. Ransum suffered from the severe impairments of depression, anxiety, and chronic obstructive pulmonary disease. (Doc. 7-3, p. 14). The ALJ also determined that Ms. Ransum had the non-severe impairments of hypertension, hypothyroidism, osteoarthritis of the hands, disorder of the spine, and obesity. (Doc. 7-3, p. 14). The ALJ found that Ms. Ransum's fibromyalgia was not a medically determinable impairment. The ALJ noted that Ms. Ransum alleged "medication side effects and a need to lie down 18 hours per day" but determined that these allegations were "not supported by any objective findings" or "associated with any medically determinable impairment." (Doc. 7-3, p. 15). Based on a review of the medical evidence, the ALJ concluded that Ms. Ransum did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, pp. 16–17).

Considering Ms. Ransum's impairments, the ALJ evaluated Ms. Ransum's residual functional capacity. (Doc. 7-3, p. 17). The ALJ determined that Ms. Ransum's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, but Ms. Ransum's statements concerning the intensity, persistence, and limiting effects of the symptoms were not fully supported

by the record. (Doc. 7-3, p. 20). The ALJ found that Ms. Ransum's medical records did not provide objective support for her allegations of disabling mental health symptoms; that no medical source had observed increased work of breathing, wheezing, or respiratory issues consistent with Ms. Ransum's alleged COPD symptoms; that no medical source had observed somnolence, atrophy, weakness, or other issues consistent with Ms. Ransum's claim that she rested 18 hours per day; and that Ms. Ransum's alleged medication side effects were unsupported by the record. (Doc. 7-3, pp. 20–21). The ALJ determined that Ms. Ransum had the RFC to:

> perform light work . . . except that she [could] occasionally climb ramps and stairs; [could] never climb ladders, ropes, or scaffolds; [could never] balance[;] . . . could frequently stoop, kneel, crouch, [and] crawl; [must] avoid concentrated exposure to extreme temperatures, extreme humidity, and pulmonary irritants such as fumes, odors, gases, and poor ventilation[,] excessive vibration[,] . . . unprotected heights or hazardous machinery; [could] understand, remember, carry out, and make simple, routine, and repetitive instructions, tasks, and decisions consistent with unskilled work; [could] maintain concentration, persistence, and pace for two-hour periods for such tasks; [could have] occasional related interaction with the general public and coworkers[] and occasional work place changes that are gradually introduced.

(Doc. 7-3, p. 17).

Based on this RFC and relying on the testimony from the vocational expert, the ALJ concluded that Ms. Ransum could not perform her past work as a jailer, store laborer, cook helper, stock clerk, credit clerk, or collector. (Doc. 7-3, p. 23). Relying on testimony from the vocational expert, the ALJ found that other jobs

existed in significant numbers in the national economy that Ms. Ransum could perform, including electrical accessories assembler, collator operator, and mail clerk. (Doc. 7-3, pp. 23–24). Accordingly, the ALJ determined that Ms. Ransum was not disabled as defined by the Social Security Act. (Doc. 7-3, p. 25).

## SUPPLEMENTAL EVIDENCE

After the ALJ issued her adverse decision and the Appeals Counsel denied review, Ms. Ransum was diagnosed with metastatic lung cancer. (Doc. 11, p. 2; Doc 11-1). Ms. Ransum has submitted a PET/CT scan report that includes the following findings:

> HEAD AND NECK: Enlarged right clavicular/retroclavicular lymph nodes with increased metabolic uptake are compatible with metastasis.
>
> CHEST: Multiple enlarged hypermetabolic lymph nodes in the right upper paratracheal, right lower paratracheal, and left lower paratracheal compatible with metastasis. Left lower paratracheal nodes have SUV 10.0 A 1.3 cm round hypermetabolic anterior mediastinal lymph node compatible with metastasis. A 3.7 x 3.2 cm central right upper lobe lung mass may be contiguous with hilar adenopathy measuring 3.6 x 3.2 cm with SUV 9.8.
>
> ABDOMEN AND PELVIS: No suspicious foci of increased FDG uptake. No enlarged or hypermetabolic lymph nodes. No adrenal or hepatic mass.
>
> SKELETAL: No suspicious foci of increased FDG uptake.

(Doc. 11-1, p. 2). Based on these findings, Dr. Robert Stone, M.D. determined that Ms. Ransum has a "central right upper lobe lung mass compatible with malignancy"

and "anterior mediastinal, bilateral middle mediastinal, right hilar and right supra clavicular metastic adenopathy." (Doc. 11-1, p. 2).[7]

## STANDARD OF REVIEW

The scope of review in this matter is limited. Under sentence six of 42 U.S.C. § 405(g), a district court may remand a claimant's matter to the Commissioner for reconsideration based on new evidence only when the claimant establishes that there is new, noncumulative evidence; that the evidence is material such that a reasonable probability exists it will change the administrative result; and that there was good cause for failure to submit the evidence at the administrative level. *See Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 821 (11th Cir. 2015).

## DISCUSSION

It is undisputed that Dr. Stone's PET/CT scan report is new, noncumulative evidence and that Ms. Ransum had good cause for failing to present the report during the administrative proceedings. *See Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987). Thus, if there is a reasonable probability that Dr. Stone's radiology report would change the administrative result, this Court must remand this matter pursuant to § 405(g) sentence six.

---

[7] Adenopathy refers to large or swollen lymph glands. NATIONAL CANCER INSTITUTE, *Adenopathy,* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/adenopathy [https://perma.cc/B5NP-UYHK] (last visited February 2, 2026).

Material evidence "must relate to the time period on or before the date of the ALJ's decision." *Reynolds v. Comm'r of Soc. Sec.*, 457 Fed. Appx. 850, 853 (11th Cir. 2012) (citing *Wilson v. Apfel*, 179 F.3d 1276, 1278–79 (11th Cir. 1999); *Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1218–19 (11th Cir. 2001); *Hyde*, 823 F.2d at 459 n.4). "[M]edical opinions based on treatment occurring after the date of the ALJ's decision may be chronologically relevant." *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1322–23 (11th Cir. 2015); *see Boyd v. Heckler*, 704 F.2d 1207, 1211 (11th Cir. 1983) (considering a physician's opinion even though "he did not treat the claimant until after the relevant determination date"), superseded on other grounds by statute, 42 U.S.C. § 423(d)(5); *Vega*, 265 F.3d at 1218–19 (remanding where a doctor discovered a herniated disk after the ALJ's decision); *Hyde*, 823 F.2d at 459 (remanding where a doctor determined that a loose prosthetic device may be causing a claimant's otherwise unexplained pain after the ALJ's decision).

Medical evidence of a condition that existed but was not discovered before the ALJ hearing is material. *See Reynolds*, 457 Fed. Appx. at 853 (citing *Vega*, 265 F.3d at 1218–19; *Hyde*, 823 F.2d at 459 n.4). So is "objective medical evidence" that supports the claimant's alleged symptoms, especially when an ALJ discredited the claimant's testimony because the record lacked such evidence. *See Hyde*, 823 F.2d at 459.

There is a reasonable probability that Dr. Stone's report would change the administrative result of Ms. Ransum's benefits application. The record regarding Ms. Ransum's lung cancer symptoms, diagnosis, and treatment is sparse. Still, Dr. Stone's report raises a reasonable inference that Ms. Ransum had an undiscovered condition at the time of the ALJ hearing. Dr. Stone found that Ms. Ransum's radiology results indicated that she had lung cancer and swelling of lymph nodes "compatible with metastasis." (Doc. 11-1, p. 2). Although Dr. Stone's report does not address how long Ms. Ransum's cancer has been developing, whether the objective imaging results are consistent with Ms. Ransum's prior reported symptoms is a question of fact appropriate for the ALJ to address.[8]

Moreover, Ms. Ransum's cancer diagnosis offers a potential objective explanation for Ms. Ransum's previously unexplained fatigue and shortness of breath. The ALJ found that the severity of Ms. Ransum's alleged COPD symptoms and fatigue were not supported by medical evidence. (Doc. 7-3, pp. 14–15). While the Commissioner argues that any connection between Ms. Ransum's cancer diagnosis and her symptoms at the time of the ALJ's decision is speculative, (*See*

---

[8] To make this determination, an ALJ may seek more information about when Ms. Ransum's cancer likely started to develop and became symptomatic. *See Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000) (citing *Sims v. Apfel*, 530 U.S. 103, 120) ("Social security disability proceedings are inquisitorial. . . . [I]t is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits."). The Court therefore declines to address this question based on the limited record before it.

Doc. 14, pp. 8–9), fatigue and shortness of breath are common and well-documented symptoms of cancer.[9] Thus, Ms. Ransum's PET/CT scan results undermine the ALJ's conclusion regarding Ms. Ransum's shortness of breath and fatigue. If the ALJ had credited Ms. Ransum's testimony regarding these symptoms, Ms. Ransum's residual functional capacity may have included restrictions that preclude employment. (*See* Doc. 7-3, p. 64–65). Accordingly, there is a reasonable probability that the new evidence presented would change the outcome at the administrative level. *See Hyde*, 823 F.2d at 459.

## CONCLUSION

Ms. Ransum has presented new, noncumulative medical evidence documenting that she was diagnosed with metastatic lung cancer after the Commissioner's final decision. There is a reasonable probability that this evidence will change the administrative result because the evidence concerns a condition undiscovered at the time of the ALJ's decision and because the evidence provides an objective explanation for Ms. Ransum's subjective complaints of fatigue and shortness of breath. Accordingly, pursuant to sentence six of 42 U.S.C. § 405(g),

---

[9] *See* NATIONAL CANCER INSTITUTE, *Cancer Fatigue,* https://www.cancer.gov/about-cancer/treatment/side-effects/fatigue [https://perma.cc/K6D4-JAV6] (last accessed Feb. 2, 2026); Kalliopi Keramida, *Dyspnea in Oncological Patients: A Brain Teaser*, PUBMED CENTRAL, (Feb. 3, 2013) https://pmc.ncbi.nlm.nih.gov/articles/PMC9947930 [https://perma.cc/7QAP-7C3Y].

the Court reverses the Commissioner's decision and remands this matter for further proceedings.

**DONE** and **ORDERED** this March 13, 2026.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE